FRANK K. STURGIS and WILLIAM H. TRUESDALE, as Trustees under the Will of FRANK WORK, Deceased, and as Trustees under Certain Deeds of Trust Thereby Created for FRANCES ROCHE and Others, and CHARLES A. TERRY, as Trustee under Said Will, Plaintiffs, *v.* FRANCES ROCHE et al., Defendants.

Supreme Court, New York Special Term, March, 1924.

Trusts — action by testamentary trustees for judicial settlement of their accounts and for judgment directing apportionment of stock dividends between capital and income — railroad company transferred coal properties to coal company organized by its officers — stockholders of railroad company, including trustees, given privilege of subscribing for stock in coal company — trustees having made such subscription sold portion of stock of coal company at premium to secure funds to pay subscription price — subscription privilege granted to trustees belongs to capital of trust estate — subscription to stock of coal company may not be considered in apportioning stock dividend of railroad company — trustees in apportioning stock dividend between capital and income directed to follow rule in 209 N. Y. 450, 484.

In an action brought by testamentary trustees for a judicial settlement of their accounts, and particularly for a judgment directing how a stock dividend paid by a railroad company shall be apportioned between capital and income, it appeared that the railroad company determined that its coal properties should be segregated and promoted a new company to be managed by its officers, to which company the coal properties were sold; that the stockholders of the railroad company, including the plaintiff trustees, were given the privilege of subscribing to the stock of the coal company, which privilege they exercised; and said trustees in order to pay for the stock of the coal company, to which they had subscribed, sold a portion thereof at a premium and allocated the remaining shares of said stock proportionately to the trusts and accounts in which the stock of the railroad company was held.

*Held*, that the book value of the railroad company's capital was not depleted by the coal company transaction for the proceeds of the sale of the coal properties were received by the railroad company and entered into its capital account in place of the property sold and the book value of the assets and the stock was increased thereby;

That the subscription privilege granted to the trustees was an incident of stock belonging to the trust estate and, therefore, belongs to the capital thereof;

That the subscription to the stock of the coal company may not be considered in apportioning the stock dividend of the railroad company between capital and income, and the trustees are directed in making such apportionment to disregard the coal company transaction and follow the rule laid down in the *Osborne Case*, 209 N. Y. 450, 484.

ACTION for judicial settlement of accounts of trustees.

*Henry B. Closson*, for plaintiffs.

*A. Loeb Salkin,* for defendants Frances Roche, Lucy Work Hewitt and Cynthia Burden Cary.

*William S. Jenney,* for Edmund Maurice Roche and Francis George Roche and guardian *ad litem* of Eileen Burden, an infant.

MITCHELL, J. This action is brought by the trustees for a judicial settlement of their accounts under the will of Frank Work, deceased, and particularly for a judgment directing how a stock dividend of 100 per cent, paid by the Delaware, Lackawanna and Western Railroad Company on or about July 28, 1921, shall be apportioned between capital and income. There are five separate trusts. One of them was created as of the date of the death of the said Frank Work, March 16, 1911, and the others were created subsequently. An issue is raised by the life beneficiaries and remaindermen under the several trusts involved, with respect to the disposition as between capital and income of the 100 per cent stock dividend paid by the Delaware, Lackawanna and Western Railroad Company. This question would present no great difficulty if it were not complicated by a transaction, the details of which are set forth in a statement prepared by William S. Jenney, the vice-president and general counsel of the Delaware, Lackawanna and Western Railroad Company, which appears in evidence as defendants' Exhibit A. This statement is entitled, " Memo with respect to the organization of the Glen Alden Coal Company," and is as follows: " The Delaware, Lackawanna and Western Railroad Company was organized under various special acts of the legislature of the State of Pennsylvania during the years from 1840 to 1870. Special charters were granted for various railroad and coal companies, which companies were merged into the parent company, so that for upwards of fifty years the parent company owned and operated both the coal mines and the railroads. Our books do not show the capital expenditures made in the acquisition of the coal properties, but it is estimated that the cost of the coal acquired by the company in fee was in the neighborhood of ten million dollars. During the last twenty years prior to the sale of the coal properties approximately a million dollars a year were expended thereon, chargeable to capital account. The capital expenditures prior to that time on the property we have no record of, but the same are estimated at some figure between five and ten millions of dollars. Under the laws of Pennsylvania, taxes must be paid on the coal as real estate, from year to year, although the coal may not be mined for years thereafter. We have probably paid twenty million dollars in taxes on the coal, three-quarters, at least, of which had not been mined at the time of the sale of the property. There are also many other matters, such as

advance payment of royalties, which make it very difficult to determine just what the book costs of the coal properties were at the time of the sale. It having been determined by our people that the coal properties should be segregated, the plan which was adopted was the following: Major Inglis, our vice-president and general manager in charge of our coal properties, was invited to promote a new coal company, which should make us an offer for the coal properties. For local reasons, it was important to acquire an old charter, so that, on behalf of the new company, he acquired an old coal charter, the name of which was changed to the Glen Alden Coal Company. All the stock of this company was acquired in the name of Major Inglis and several of his associates. It offered our company sixty million dollars for all the coal properties, which offer was accepted by our board of directors, subject to the approval of the stockholders. Thereupon a contract was prepared for the sale of the property. There was no express agreement on the subject, but it was, of course, understood that Major Inglis would invite all of our stockholders to subscribe to stock in the Glen Alden Company on the basis of their stock holding in the Lackawanna Company. This was essential to the successful organization of the Glen Alden Company because otherwise infinite questions would have arisen which would have resulted in litigations. It was also essential to obtain the approval of our stockholders, and if they were to be invited to subscribe to the stock the questions, such as the adequacy of the consideration and terms of sale, were of little consequence if they availed themselves of the right to subscribe. Accordingly, the Glen Alden Company sent to our stockholders, on May 16, 1921, a circular notice, of which the attached is a copy. On the same date our company sent a notice to stockholders, copy of which is attached. At the close of business on June 15 we gave the Glen Alden Company our stock list, whereupon it prepared subscriptions for the stock of the company to the amount of one share of new Glen Alden stock for one share of Lackawanna stock, which it sent to all of the stockholders of the company on June 18 in the attached form. A considerable number of the stockholders did not at first subscribe, but eventually practically all did so. At the meeting of our stockholders on July 21 the contract for the conveyance of the coal properties, copy of which I also attach, was duly approved by resolution of the stockholders. Under the terms thereof deeds were prepared of the coal properties, which were duly executed, and the Glen Alden Coal Company started doing business on September 1, 1921." The notice by the Delaware, Lackawanna and Western Railroad Company to their stockholders, above referred to, advised

them that the interstate commerce commission had approved the issuance of $45,000,000 of additional capital stock and that a special meeting of the stockholders would be held on July 21, 1921, to authorize the proposed increase in the amount of capital stock and that, if approved by the stockholders, a stock dividend of 100 per cent would be declared. It also advised the stockholders of the railroad company that a contract for the sale of the anthracite coal properties of the railroad company had been prepared and would be submitted to them at the special meeting for their approval. " The proposed consideration therefor," this notice informed the stockholders, " is the sum of sixty million dollars, with interest at four per cent, to be secured by a purchase money mortgage upon the real estate conveyed." The notice sent out by the Glen Alden Coal Company to the stockholders of the Delaware, Lackawanna and Western Railroad Company dated May 16, 1921, referred to in the above statement, advised the said stockholders of the proposal by the coal company to purchase the aforesaid coal properties and that it would offer its stock for subscription " to the stockholders of the Delaware, Lackawanna and Western Railroad Company of record at the close of business June 15, 1921, on the basis of one share of Glen Alden Company stock for each share of railroad company stock at five dollars ($5.00) per share, payable on or before August 20, 1921." This notice contained the further information that the Glen Alden Coal Company " will be operated by officials now employed in the coal mining department of your company, the vice-president and manager of such department having been selected as its president." Both of these notices (plaintiff's Exhibits 10 and 11) were received by the trustees, the plaintiffs herein. On or about August 19, 1921, the plaintiffs as trustees and as stockholders of the railroad company availed themselves of the invitation to subscribe to the stock of the Glen Alden Coal Company, and subscribed for and purchased 14,434 shares thereof at five dollars per share. On the same day, in order to provide themselves with funds to pay for the stock so subscribed for, the trustees sold 2,200 shares of said coal company stock at the market and realized the sum of $35.35 for each of said shares, which was the prevailing market price at that time. The shares of the Glen Alden Coal Company remaining in the hands of the trustees, viz., 12,234 shares, they allocated proportionately to the trusts and accounts in which the stock of the railroad company was held. Counsel for the life beneficiaries contends (1) that the transaction by which the railroad company sold its coal properties to the Glen Alden Coal Company involved a *pro rata* distribution of its capital assets; (2) that from the value of the trust investment in railroad company

stock, as at the creation of the trust, there must be deducted the value of this claimed partial distribution of the capital assets of the railroad company represented by the Glen Alden Coal Company transaction and that only the remainder should be regarded as the trust investment, the integrity of which must be maintained under the rule laid down in *Matter of Osborne*, 209 N. Y. 450, and (3) that consequently, the value of the trust investment being unimpaired by the distribution of the 100 per cent stock dividend all of the stock so received as such dividend should be declared the property of the life tenants. Counsel for the remaindermen, on the other hand, contend that in any aspect of the case the Glen Alden stock remaining in the hands of the trustees is an accretion to capital and belongs to the corpus of the estate, to be shared by life beneficiaries and remaindermen on the same terms as the balance of the corpus. The remaindermen hold that the Glen Alden stock cannot be considered in the nature of a *pro rata* distribution of the capital assets of the railroad company, and that it must be disregarded altogether in the apportionment of the 100 per cent stock dividend of the railroad company between life beneficiaries and remaindermen under the several trusts involved. In *Matter of Osborne*, 209 N. Y. 450, 477, 484, the Court of Appeals declares the law in respect to the apportionment between life tenants and remaindermen of extraordinary dividends, whether payable in stock or in cash, as follows: " Extraordinary dividends, payable from the accumulated earnings of the company, whether payable in cash or stock, belong to the life beneficiary, unless they entrench in whole or in part upon the capital of the trust fund as received from the testator or maker of the trust or invested in the stock, in which case such extraordinary dividends should be returned to the trust fund or apportioned between the trust fund and the life beneficiary in such a way as to preserve the integrity of the trust fund." P. 477. " The proposition decided by us in this case is, that in all cases of extraordinary dividends, either of money or stock, sufficient of the dividend must be retained in the corpus of the trust to maintain that corpus unimpaired and the remainder thereof must be awarded to the life beneficiary. The method of accomplishing this result is not difficult. The intrinsic value of the trust investment is to be ascertained by dividing the capital and the surplus of the corporation existing at the time of the creation of the trust by the number of shares of the corporation then outstanding, which gives the value of each share, and that amount must be multiplied by the number of shares held in trust. The value of the investment represented by the original shares after the dividend has been made is ascertained by exactly the same method. The

difference between the two shows the impairment of the corpus of the trust. * * * If the dividend is in stock the amount of impairment in money must be divided by the intrinsic value of a share of the new stock, and the quotient gives the number of shares to be retained to make the impairment good — the remaining shares going to the life beneficiary. Market value, good will and like considerations cannot be considered in apportioning a dividend." Pp. 484, 485. The question presented for determination here involves the application of the above rule to the facts herein involved. Counsel for the life beneficiaries arrives at the conclusion that the Glen Alden Company stock transaction involved a partial distribution of the capital of the railroad company by adding the premium value in the open market of the total number of shares of Glen Alden Company stock issue (the trustees having received the sum of $27.35 in excess of the subscription price for each share of Glen Alden stock which they sold in open market), found to be $23,000,000, to the purchase price of the coal properties, making the total sum of $83,000,000, which is the claimed value of the coal properties. The amount of the purchase-money bonds and mortgage, $60,000,000, is then subtracted from the sum of $83,000,000, leaving the sum of $23,000,000 as the total of the claimed capital distribution, or $27.35 on each share. In other words, in the view of the life beneficiaries, there was a capital distribution equal to the difference between the market value of the coal company stock on or about August 19, 1921, the date of the sale by the trustees of the coal company stock at the market, and the subscription price thereof. Of course, if this view may be accepted as correct, no impairment of the value of the corpus of the trust would result from the declaration of the stock dividend. I agree with the statement of the life beneficiaries in the memorandum submitted on their behalf that the record is barren of any proof of the difference between the actual value of the coal properties sold and the purchase price received therefor, but has the market value of the coal company stock any such direct and necessary relation to the actual value of the coal properties as would justify its use as a basic factor in determining the actual value of the coal properties? I think not. There are speculative elements which enter into the market value of corporate stock which are quite independent of the value of the corporate assets and deprive the market value of significance as a measure of the actual value of the corporate assets. Speculative factors enter largely into the fluctuation in the market value of stock and this alternating movement does not necessarily depend upon any increase or decrease in the value of the corporate assets. It is common experience that fluctuation in market price may result

from circumstances having no relation to present value of the corporate assets, which produce an eagerness upon the part of investors or speculators to buy or an eagerness to sell. The market price at times is determined largely by considerations which are anticipatory. It is suggested by counsel for the remaindermen that the reason for the valuation by the public of the Glen Alden stock in excess of the subscription price was the confidence in the Lackawanna management because of the large earnings both of the railroad company and of the Delaware, Lackawanna and Western Coal Company, organized some years before to sell the railroad company's coal. This may or may not have been so. And, if so, it is impossible to say definitely to what extent this consideration may have entered into the market price of the Glen Alden Coal Company stock. It serves, however, as an illustration of the contingent considerations which sometimes produce an eagerness upon the part of the public to buy and hence form a factor in determining the market value of corporate stock. The market movement in price is uncertain, fortuitous and largely unpredictable, due to the injection of elements adventitious to the value of the corporate assets or at least bearing no such direct and necessary relation thereto as would justify its use as a measure of their value. The railroad property sold to the Glen Alden Coal Company is replaced by the $60,000,000, which was the price at which the stockholders were content to sell and which must be accepted as the full value of the coal properties sold. There is certainly no proof upon which any other value could be arrived at. The court may not utilize an uncertain, contingent and fortuitous element in an attempt to estimate the value of a hyp thetical equity supposed by the life beneficiaries to reside in the difference between the subscription price and the market price of the Glen Alden stock. The Glen Alden subscription privilege was incident to the ownership of the Delaware, Lackawanna and Western Railroad Company stock, but did not emanate from it as a property right. The property for which the Glen Alden stock stood was that of the coal company and not that of the railroad company. The book value of the railroad company's capital was not depleted by the transaction, for the proceeds of the sale of the coal properties were received by the railroad company and entered in its capital account in place of the property sold and the book value of the assets (and stock) increased thereby upwards of $58,000,000, or $50 per share. It appears to be the view of the life beneficiaries that under the rule announced in the *Osborne Case, supra,* the corpus of the trust fund may not be increased, but must necessarily continue at its original

book value. That no such conclusion may be drawn from the rule announced in the *Osborne* case is clear from the language of the Court of Appeals in *United States Trust Co.* v. *Heye*, 224 N. Y. 242, 252, 253, as follows: "The idea prevailing with these claimants seems to have been that the value of the principal at the time of the creation of the trust determines the rights of the life beneficiaries and the remaindermen; that so long as the principal is in no way depleted or lessened, all the subsequent increase in value must be categoried as income, whether distributed as such or not. *Matter of Osborne* (209 N. Y. 450, 477) is given as authority for this proposition, but that case went no further than to hold that the principal of a trust fund invested in corporate stock should not be impaired by the division of accumulated surplus among life beneficiaries. 'Extraordinary dividends,' it was there said, 'payable from the accumulated earnings of the company, whether payable in cash or stock, belong to the life beneficiary unless they intrench in whole or in part upon the capital of the trust fund as received from the testator or maker of the trust or invested in the stock, in which case such extraordinary dividends should be returned to the trust fund or apportioned between the trust fund and the life beneficiary in such a way as to preserve the integrity of the trust fund.' This does not mean that the principal of the trust fund has to remain at the same value, and that all increase belongs to the life beneficiaries. While the corpus of the fund may not be depleted, yet the corpus may accumulate or increase, and until there is some division in the nature of a dividend payable out of accumulated earnings or profits, there is nothing that can be awarded as income to beneficiaries." At pages 254 and 255 the court further said: "The fundamental principle involved in these questions is whether there has been a *distribution* or *division* of the earnings, profits or accumulations of the corporation. Until there has been such division, the life tenant is not entitled to any increase in the value of the principal of the trust fund, or the capital and assets of the corporation, shares of which constitute the trust fund. But when there has been a division of the corporate property, no matter what form it may take, that part thereof which consists of accumulated profits or earnings belongs to the life tenant and that which is capital to the remainderman." Of course, it is obvious that so far as the Glen Alden stock transaction is concerned, there was no "distribution or division of the earnings, profits or accumulations of the corporation." Whether the invitation and privilege accorded to the trustees in common with the other stockholders of the railroad company by the Glen Alden Coal Company was a so-called "right," or a mere option or privilege, does not affect the result. The sub-

scription privilege was an incident of stock belonging to the trust estate, and, therefore, belongs to the capital thereof. In the case of *Baker* v. *Thompson*, 181 App. Div. 469; affd., 224 N. Y. 592, the court said (at p. 473): " It has uniformly been held in this State that new shares of stock purchased by trustees in the exercise of subscription rights given to the stockholders, and the proceeds of the sale of such subscription rights are capital of the trust estate to which the life beneficiary is not entitled." Citing cases. Further on the court said: " The right to subscribe is an incident to the ownership of the stock. Any value that attaches thereto properly goes to the enhancement of value of the stock which, not being the product of income, nor taken from income, is not to be distributed to those entitled to income. The capital of the trust is enhanced in value, and the income is increased by the result of the larger sum invested." To adopt the language of the court in *Ballantine* v. *Young*, 79 N. J. Eq. 70, 75: " The option to subscribe to shares of the coal company is, evidently, capital. It was the right to purchase on favorable terms a new thing. If an option to subscribe to new stock of a corporation, whose stock the trustees hold, is capital, *a fortiori*, is an option to purchase stock they do not hold." The Glen Alden stock subscription may not be considered at all in apportioning the 100 per cent stock dividend of the Delaware, Lackawanna and Western Railroad Company. In apportioning this stock dividend between capital and income the trustees are directed to disregard the Glen Alden Coal Company transaction and follow the rule laid down in the *Osborne Case*, 209 N. Y. 450, 484, the result of which as applied to the Cynthia Burden trust is correctly set forth in the memorandum submitted by counsel for the trustees. The rule will be applied in like manner to the Delaware, Lackawanna and Western Railroad Company shares held in trust for Edmund Maurice Roche and Francis George Roche under the so-called family agreement of February 20, 1914. The prayer for relief contained in the complaint is granted with the instructions to the trustees above set forth. Submit proposed findings and decree in conformity to the views indicated herein.

Judgment decreed accordingly.